IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT,
IN AND FOR DESOTO COUNTY, FLORIDA

1944 WOODCUT DRIVE LAND TRUST,
By: ABPAYMAR, LLC, as Trustee,

    Plaintiff,

v.

Case No.:

THE BANK OF NEW YORK MELLON fka
THE BANK OF NEW YORK, as Trustee for the
Certificateholders of CWABS, Inc., Asset-Backed
Certificates, Series 2007-2,

    Defendant.

_____/

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, 1944 WOODCUT DRIVE LAND TRUST, By Abpaymar, LLC, Trustee ("Plaintiff"), by and through its undersigned counsel, sues Defendant, The Bank of New York Mellon, f/k/a The Bank of New York, as Trustee for the Certificateholders of CWABS, Inc., Asset-Backed Certificates, Series 2007-2 ("Defendant"), and alleges:

## BACKGROUND

1. All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2. Venue is proper in DeSoto County, Florida, as the cause of action accrued here.

3. On January 12, 2007, Lauren Demattia and Robert Demattia ("Demattia") entered a promissory note ("the Note") with Countrywide Home Loans, Inc. ("CHL") which Note purported to be secured by a mortgage ("the Mortgage"), as recorded in the Pasco County Official Records in connection with their ownership of the property located at 1944 Woodcut Drive in

Lutz, Florida ("the Property"). Title to the Property thereafter transferred to Plaintiff, which owned it at all times relevant.

4. Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage also read like a contract, requiring Plaintiff to remit monetary payments, including payments of property taxes and insurance.

5. Shortly after closing on the Plaintiff's loan, CB sold the Note to the depositor, CWABS, Inc. ("CWABS" or "the Depositor"), which bundled the Note together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6. Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust, which in this case was CWABS, Inc., Asset-Backed Certificates, Series 2007-2 ("the Trust").

7. Pursuant to the terms of the prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8. Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or

hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code 860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Defendant knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9. Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, CWABS, and the Issuing Entity, including that the Mortgage Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with CWABS and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10. Bank of New York Mellon ("BONY") never owned or held the Notes, either. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure

the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11. BONY's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12. Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to CWMBS and having their purchase price returned – essentially, a refund.

13. By 2011, Countrywide Financial, Countrywide Bank, N.A., and Countrywide Bank, FSB had all violated their charters, were purchased by other banking entities, and were no longer in business. As Trustee of the Trust, BONY was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so.

14. In 2011, the Certificateholders filed suit against the Trustee (Defendant in this case) and all parties encompassing Defendant in a lawsuit in New York ("the New York Lawsuit"), including CWALT, CWMBS, CWABS (and other, similarly-situated depositors), asserting they were entitled to an increased cash flow of $432 billion. The New York Lawsuit was a Derivative Shareholder Class Action Lawsuit, filed in the Southern District of New York under CPL 77, where shareholder lawsuits and claims pertaining to the Trust had to be heard.

15. When CWABS was unable to issue refunds or replace the cashflows, Bank of America was compelled to review its responsibilities for the different Countrywide entities that it had taken over.

16. Realizing the impracticalities of full payment, Bank of America stepped in and offered to assist with a settlement, ultimately offering $8.5 billion dollars to buy out the default responsibility to the Certificateholders. Yet BONY, as the securities administrator, was the party responsible for paying the settlement to the Certificateholders.

17. Acting as a successor in interest to the particular Countrywide Entities involved in these particular 530 Real Estate Mortgage Investment Conduits, Banc of America Corporation and BANA believed it in the best interests of the Certificateholders to resolve all claims of CWALT, CWMBS, CWABS and the similarly-situated depositors on all aspects of the defaults of the Loans by providing a Settlement of $8.5 Billion Dollars. Subsequently, BONY as Securities Administrator, working with their financial advisors and attorneys, believed it prudent, on behalf of the Plaintiff Certificateholders interests, to accept the payment of $8.5 billion as payment in full for all past, present and future defaults of the underlying mortgage loans included in all of the 530 REMIC Trusts.

18. After extensive litigation, Index Number 651442/2011, the judge in the New York Lawsuit ruled that the $8.5 billion payment was payment in full of all defaults arising from the Loans. As part and parcel of that ruling, all Plaintiffs and all Defendants in the New York Litigation, including BONY and the Certificateholders, issued releases for any and all claims arising under the Loans and were barred from any continuing litigation against any and all released parties, including Plaintiff. As part and parcel of that ruling, jurisdiction for any subsequent claims was ordered to remain exclusively in New York.

19. At all times, Defendant knew the rulings of the New York Lawsuit. It also knew the only court of competent jurisdiction for any claims regarding the Trust was and is the Southern District of New York, not a Florida State Court.

20. In March, 2008, Demattia stopped making payments under the Note – one of many Borrowers who did so. Thereafter, a lawsuit was filed against them, Pasco 2014-CA-3030 ("the Lawsuit"), with Defendant named as the plaintiff. The genesis of the Lawsuit was Defendant's attempt to foreclose the Mortgage and divest Plaintiff of title to the Property.

21. For several reasons, Defendant's filing of the Lawsuit and its prosecution thereof was fraudulent, illegal, and perjurious, rendering the entire proceeding, and any rulings emanating from it, void.

22. First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Notes. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

23. Second, any attempts to foreclose the Note were expressly barred by the Litigation, as all such claims were fully paid and released, and jurisdiction for those claims lied exclusively in New York. Defendant knew this, yet it intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, perjurious, and contemptuous attempt to foreclose the Mortgage and steal the Property from Plaintiff.

24. Third, the Lawsuit was brought in the name of the Certificateholders, who were identified in the style of the Lawsuit as the party prosecuting the case, *i.e.* "Bank of New York, as Trustee for the Certificateholders …" Nonetheless, the Certificateholders did not authorize the

6

Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in their name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

25. Despite the foregoing, Green Tree Servicing, LLC ("Green Tree"), purporting to act as Defendant's servicer and agent with authority to bind Defendant, caused the Lawsuit to be prosecuted in Defendant's name and represented that it was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

26. To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times during the duration of the Lawsuit, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, i.e. "the Servicer" and sometimes the plural, i.e. "the Servicers").

27. First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Certificateholders the plaintiff in the Lawsuit, i.e. "Bank of New York, as Trustee, on behalf of the Holders…", to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

28. Second, the Servicer caused to be recorded in the Official Records of Pasco County, Florida a Notice of Lis Pendens in connection with the Lawsuit. As the representations made in the Lawsuit were fraudulent, so, too was this notice. The notice hence violated Fla. Stat. §§ 817.535(2)(a) and 817.54 – a criminal infraction under the law.

29. Third, the Servicer caused Defendant to represent in the Lawsuit that it had been damaged as a result of Demattia's payment default under the Note. That representation was knowingly false, fraudulent, and perjurious at all times relevant. After all, such claims were released as part and parcel of the New York Litigation described above. In addition, Defendant did not gain or lose anything by virtue of Demattia's payments or non-payments under the Note as a result of the securitization process described herein.

30. Fourth, the Servicer caused to be recorded in the Pasco County Official Records an Assignment of Mortgage ("the Assignment"). The Assignment purported to show a conveyance of the Note from Mortgage Electronic Registration Systems, Inc. ("MERS") to Defendant. Yet it was a complete fraud. MERS did not execute the Assignment in the ordinary course of business. Rather, the Servicer's own attorneys prepared and caused the Assignment to be recorded to create the appearance of standing in Defendant's name where such standing was otherwise lacking. After all, MERS had no authority to assign the Mortgage in its own name, only in its capacity as nominee. Moreover, by the time of the Assignment, CHL had already sold the Note and Mortgage to the Depositor, so MERS had nothing to convey. Suffice it to say the recording of the Assignment was fraudulent, in violation of Fla. Stats. §§ 817.535(2)(a) and 817.54.

31. Fifth, the Servicers stamped an endorsement on the Note, purporting to show a conveyance from CHL in blank ("the Endorsement"). The Endorsement, however, was a complete fraud. After all, it was neither executed nor stamped by Michele Sjolander in her capacity as an

agent of CHL in the ordinary course of business. Rather, the Endorsement was stamped onto the Note by the Servicer after CHL ceased to exist and after Sjolander had no relationship with CHL. This was done in a fraudulent effort to convey standing in the name of Defendant in the Lawsuit where no such standing otherwise existed.

32. Fifth, the Servicers knew that Defendant was not owed any monies arising from any non-payment by Demattia, as the Certificateholders were paid in full for all defaults of the Loans and accepted payment from the Servicers that was provided to BONY to give to the Certificateholders.

33. To illustrate, a notice was sent to all participants in the New York Lawsuit on February 24, 2016. It is Index No. 150973/2016, Notice of Judicial Instruction Proceeding concerning the proper distribution to Certificateholders in the 530 Settlement Trusts of the $8.5 Billion Settlement payment relating to the Countrywide Settlement Agreement.

34. Both BONY and the Servicers received that notice, pursuant to the New York Court's instructions that it be given "to the holders and beneficial owners" of the certificates a/k/a notes issued by the Five Hundred and Thirty (530) Countrywide mortgage-backed securitization trusts and other persons potentially interested in the covered Trusts.

35. At all times relevant, BONY knew that the actions of the Servicers in the recording of the Assignment were fraudulent and illegal. Nonetheless, BONY has intentionally engaged in a years-long pattern of facilitating the fraudulent and illegal acts of servicers on the one hand while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

36. For instance, in its capacity as Trustee, BONY has executed many limited powers of attorney ("LPOA" in the singular, or "LPOAs" in the plural). Its purpose in conveying the LPOAs was to create the appearance of an agency relationship even if one did not actually exist,

enabling the Servicers to go to court and create the impression they were an agent of BONY and authorized to prosecute a foreclosure in BONY's name and otherwise act on its behalf even if actual authority were lacking.

37. At the same time, though, BONY knew the Servicers were using BONY's name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, BONY wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) BONY insisted that the LPOAs include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) BONY insisted that the servicers indemnify BONY for all actions taken on its behalf; and (iii) when high-ranking officers within BONY, *e.g.* Ken Hashimoto ("Hashimoto"), Jerry Facendola ("Facendola"), Gavin Sangh ("Sangh"), and Loretta Lindberg ("Lindberg"), were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct, even going so far as to disclaim knowledge that servicers were prosecuting foreclosure lawsuits in Florida in BONY's name at all.

38. Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers like BANA – perpetuated in the name of BONY, as Trustee – Hashimoto, Facendola, Sangh, and Lindberg, within the course and scope of their employment with BONY, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public.

39. Despite its feigned ignorance, BONY knew full well what was happening. In fact, even after Plaintiff's agent addressed the details of the misconduct with Hashimoto, Facendola, Sangh, Lindberg, and other, high-ranking officers of BONY in detail, BONY failed to take

remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, as recently as February, 2020, BONY continued to execute LPOAs for these servicers, knowing the servicers were using the LPOAs to engage in the misconduct described herein.

40. Further proof that BONY's "ignorance" of the servicers' illegality was feigned, and that BONY knew full well what the Servicers were doing, is seen in the indemnification agreements between it and the servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, BONY, *i.e.* the principal, wanted servicers like BANA, *i.e.* the agent, to indemnify BONY for all actions the servicers took in their name. The obvious reason for such an unusual indemnification is that BONY knew that Servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and BONY wanted someone else to pay in the event the fraud scheme ever came to light.

## COUNT ONE

41. This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages in excess of $30,000, exclusive of interest, attorney's fees, and costs.

42. Plaintiff realleges and incorporates by reference paragraphs 1-40 above.

43. Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4). To wit, through a pattern of criminal activity, the recording of the Assignment, the recording of the Lis Pendens, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant acquired and maintained an interest in

the Property (or at least purported to), divested Plaintiff of title, and prevented Plaintiff from selling it.

44. As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of the Property and the attorney's fees and costs incurred defending the Lawsuit.

45. Under the terms of Fla. Stat. § 772.104, Plaintiff is entitled to treble damages.

WHEREFORE Plaintiff demands judgment against Defendant for damages, general and special, treble damages, interest, attorney's fees, and costs. Plaintiff further demands a trial by jury and such other and further relief that this Court deems proper.

This 6th day of November, 2020

/s/ MLL
MEGAN LAZENBY, Esquire
Lazenby Law, LLC.
4927 Southfork Drive
Lakeland, FL 33813
Telephone: 863.698.6844
Florida Bar No. 0014285
Lazenbylaw@gmail.com